IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JENNIFER AKRIDGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:17-cv-372-JTA |
| | ) | (WO) |
| ALFA MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jennifer Akridge alleges that her former employer, the Alfa Mutual Insurance Company, violated the Americans with Disabilities Act when it denied her reasonable accommodation and discriminated against her on the basis of her disability. (Doc. No. 15 at ¶¶ 24-25.)  Now before the Court are Defendant's Motion for Summary Judgment (Doc. No. 192) and Defendant's Motion to Strike (Doc. No. 198).  The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Docs. No. 20, 21.)  The motions are ripe for review.[1]

After careful consideration of the facts, the parties' arguments and the applicable law, the Court concludes that the motion for summary judgment is due to be GRANTED and the motion to strike is due to be DENIED.

---

[1] (*See* Docs. No. 192, 193, 196, 197, 198, 199, 200.)

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case."  *McGee v. Sentinel Offender Servs., LLC,* 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Factual assertions must cite to specific materials in the record, including affidavits, depositions, declarations, and interrogatory answers.  Fed. R. Civ. P. 56(c).  Unsupported conclusions and factual allegations are insufficient to create a genuine issue of material fact.  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  Also insufficient are allegations based on speculation.  *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005).  *See also Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996)

2

("[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment."). Finally, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." *Anderson*, 477 U.S. at 247–248. In reviewing a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc*., 920 F.3d 704, 707 (11th Cir. 2019).

## II.     FACTUAL BACKGROUND[2] AND PROCEDURAL HISTORY

### A.     Akridge's Employment

Jennifer Akridge began her employment with Alfa Mutual Insurance Company ("Alfa") in 1989 as an agency clerk. In 1998, Akridge became a manager in Alfa's Auto Underwriting Department. (Doc. No. 195-3 at 1, ¶ 2.) Beginning in April of 2015, Akridge worked as a strategic coordinator in the company's Property and Automobile Underwriting Division. (Doc. No. 194-2 at 23.) Her primary task as strategic coordinator was working with Alfa's district managers to identify the most profitable policies for agents in their

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including Akridge's deposition transcript and exhibits thereto (Doc. No. 194-2); Akridge's Affidavits (Doc. No. 195-3); Scott Forrest's deposition transcript (Doc. No. 194-11); Susan White's deposition transcripts and exhibits thereto (Docs. No. 194-6, 194-9); Tommy Coshatt's deposition transcript and exhibits thereto (Doc. No. 194-3); Beth Chancey's deposition transcript and exhibits thereto (Doc. No. 194-4); and Robert Plaster's deposition transcript and exhibits thereto (Doc. No. 194-5). As it must when ruling on a motion for summary judgment, this Court views this evidence in the light most favorable to Akridge, the non-movant, and draws all justifiable inferences in her favor. *Anderson*, 477 U.S. at 255.

areas.  (*Id*. at 16-18.)  She organized in-person workshops throughout Alfa's service area to help agents become more profitable by collecting business intelligence information – referred to as "Strategic Underwriting Reports" – for distribution to district managers that furthered this effort.  (*Id*. at 17-23.)  Akridge estimates that her work as a strategic coordinator reduced Alfa's losses by two million dollars during her first nine months in that position.  (*Id*. at 40.)  Akridge was also responsible for insurance filings for automobile and watercraft manuals, and verified coverage on automobile claims in pending lawsuits. (*Id*. at 25-26.)

Akridge received excellent performance evaluations every year since 1992 and was Alfa's Employee of the Year in 1995.  (Doc. No. 195-3 at 1, ¶ 3.)  She maintained this outstanding work record despite being diagnosed with multiple sclerosis ("MS") in 1993 and missing approximately ten weeks of work on short term disability.  (*Id*.)  She took short term disability again in 2001 and 2003 due to untreatable migraine headaches.  (*Id*. at 2, ¶ 5.)

In 2016, Akridge was supervised by Director of Underwriting Services, Robert Plaster,[3] who reported to the Vice President of Property and Casualty Operations, Beth Chancey.  (Doc. No. 194-3 at 13-14, 20.)  Chancey reported to Tommy Coshatt, who was Alfa's Senior Vice President of Property and Casualty Underwriting.  (*Id*. at 11; Doc. No. 194-2 at 8.)  Also, during this time, Susan White served as Alfa's Employee Relations and

---

[3] Plaster retired as Alfa's Director of Underwriting Services in 2017.  (Doc. No. 194-3 at 14.)

Training Manager.  (Doc. No. 194-6 at 10.)  In that role, she was responsible for handling disability discrimination claims.  (*Id*. at 29.)  Scott Forrest was the Senior Vice President of Human Resources and Facilities.  (Doc. No. 194-11 at 21.)[4]

Akridge informed Coshatt about her MS and migraines in 2015, and told Plaster about these conditions when he became Akridge's supervisor in 2016.  (Doc. No. 195-3 at ¶¶ 6-7.)  On the occasions when she had to call in late to work, Akridge told Plaster that her migraines were the cause of her tardiness.  (*Id*. at ¶ 6.)  Alfa paid the cost of treating Akridge's MS and migraines because the company is self-insured.[5]  (Doc. No. 195-3 at 2, ¶ 8.)  Akridge estimated that her medications cost Alfa as much as eleven thousand dollars per month.[6]  (*Id*. at ¶ 8.)

During 2015 and 2016, Alfa was developing computer software called "Guidewire," which Akridge estimated to cost one hundred and sixty million dollars.[7]  (Doc. No. 194-2 at 7.)  Though expensive,[8] Alfa surmised the implementation of Guidewire would facilitate

---

[4] At some point during Akridge's employment, Forrest made unwanted advances toward her. (Doc. No. 195-3 at 6, ¶ 8; Doc. No. 194-2 at 92-93.)  Forrest ceased all communications with her after she politely rejected these advances.  (Doc. No. 195-3 at 6, ¶ 8; Doc. No. 194-2 at 92-93.)

[5] Alfa provides a self-insured health insurance plan to its employees that is administered by Blue Cross Blue Shield.  (Doc. No. 194-11 at 122, 131.)  Scott Forrest is listed on the Blue Cross Enrollment Agreement as the decision-maker for Alfa.  (Doc. No. 194-11 at 122.)

[6] Forrest agreed that it is "more than likely" that Alfa incurred costs every time Akridge or any other employee "got a drug" or "went to the doctor."  (Doc. No. 194-11 at 131.)

[7] Forrest confirmed that Guidewire cost one hundred and fifty million dollars "in round numbers." (Doc. No. 194-11 at 87.)

[8] Cutting costs was a goal at Alfa as Plaster was always encouraged by his supervisor, Chancey, to cut Alfa's operational costs wherever possible and was aware that Alfa President Jimmy Parnell also desired cost cutting wherever possible.  (Doc. No. 194-5 at 62.)

more efficient operations.  (*Id*.)  For example, Coshatt explained that Guidewire enabled district managers to directly access the strategic underwriting information previously gathered and distributed by Akridge.  (Doc. No. 194-3 at 43-45.)  Coshatt cited the automation capabilities of Guidewire in the decision to eliminate two field service staff positions in 2015,[9] and noted that the program "changed how [Alfa does] business."  (*Id*. at 36.)

In 2016, Coshatt, Chancey and Plaster made a management decision that Akridge's job should be eliminated.  (Doc. No. 194-3 at 25-27; Doc. No. 194-4 at 68-69; Doc. No. 194-5 at 48-49.)  After reaching this decision, Coshatt and Chancey informed White, who provided guidance on the process of eliminating positions within the company.  (Doc. No. 194-3 at 28; Doc. No. 194-5 at 49.)  White was not consulted about Akridge's disability or health issues but was merely involved because the managers decided that they no longer needed the position.  (Doc. No. 194-6 at 14.)  White's role was to "walk [Coshatt and Chancey] through . . . the administrative steps of the termination process."  (*Id*. at 14-15.)  These steps included "drafting a severance agreement, answering basic questions about payments, final paycheck arrangements, things like that."  (*Id*. at 15.)  White did not

---

[9] Coshatt explained how Alfa needed fewer employees after the implementation of Guidewire. (Doc. No. 194-3 at 36.)  According to Coshatt, in addition to the elimination of two field service positions, the Underwriting Division had nineteen fewer employees in 2018 than in 2015.  (Doc. No. 194-3 at 37.)  According to White, Alfa's Underwriting staff was reduced by 16 employees between 2015 and 2018.  (Doc. No. 194-9 at 167.)  Coshatt testified that Alfa also absorbed several positions through attrition and retirements.  (Doc. No. 194-3 at 37.)  For example, Akridge's former supervisor, Robert Plaster, was among the employees who were not replaced after retirement. (Doc. No. 194-4 at 64-66.)

consider the health insurance costs of Akridge's illnesses because she did not have access to that information and it was not pertinent to the decision to eliminate the position.[10]  (*Id*. at 17-18, 38.)  White recalled notifying Forrest about the elimination but did not go into any detail with him.  (*Id*. at 18-19.)

Akridge was informed by Plaster and Coshatt that her position was being eliminated on December 2, 2016.  (Doc. No. 194-2 at 6-7.)  She was told that the decision was made in the interest of cutting costs companywide[11] and was partially due to expenses associated with the development of Guidewire.  (*Id*.)  Akridge disputes that reason and maintains the high costs of her treatments for MS and migraines were the reason her job was eliminated.  (Doc. No. 194-2 at 42.)  According to Akridge, those medical costs were accessed by

---

[10] White testified that she had no knowledge of how Blue Cross bills Alfa.  (Doc. No. 194-9 at 73.) She further testified that responsibility for the maintenance of the health plan lies with the Benefits Manager and Alfa's senior management is not informed of an individual employee's healthcare costs.  (*Id*. at 73-74, 78-79.)

[11] Coshatt acknowledged that the decision to terminate Akridge was based upon "the salary and the position responsibilities and whether we needed that or not.  And obviously when we automate, those position responsibilities go away."  (Doc. No. 194-3 at 116.)  Coshatt agreed that Akridge's salary and other benefits were part of Alfa's costs savings.  (*Id*.)

Human Resources personnel[12] and relayed to Coshatt, Plaster, Chancey and Forrest. [13]  (*Id.* at 48-49, 57-58.)  While Akridge did not know which Alfa executive made the decision to eliminate her job, her long tenure with the company informed her that no person was terminated without the involvement of the Human Resources department.  (*Id.* at 45, 47-48.)  Akridge did not know whether Alfa hired a replacement to perform her former job.[14] (Doc. No. 194-2 at 79, 117.)

---

[12] Akridge supported her position that Alfa receives an individual employee's medical information with an example related to her post-termination insurance purchased through Alfa pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").  (Doc. No. 194-2 at 51-54.)  She was informed by Blue Cross in August 2017 that a migraine medication would no longer be covered by her plan and that she should contact Alfa.  (*Id.* at 52; Doc. No. 195-16.)  When she contacted Alfa she was told that the medication was no longer available to her due to the high cost.  (*Id.* at 51-54.)  According to Akridge, Forrest's position as director of Human Resources for Alfa allowed him access to the costs of her medical treatment and he used that knowledge to discontinue her medication under the COBRA plan.  (*Id.* at 56-58.)

[13] Akridge had no personal knowledge that her healthcare costs were accessed, but asserts that "[b]ased on my job being eliminated rather than being realigned or demoted like other people within the same department or reorganized to different areas, yes, I feel like, yes, my information was considered."  (Doc. No. 194-2 at 77.)

On the other hand, Coshatt, Chancey and Plaster each denied having knowledge of Akridge's healthcare costs.  (*See* Doc. No. 194-3 at 51-52; Doc. No. 194-4 at 44-45; Doc. No. 194-5 at 76.)  Forrest and White also denied any knowledge of an individual employee's healthcare costs.  (*See* Doc. No. 194-11 at 86; Doc. No. 194-6 at 16-18.)  When asked about a statement by an Alfa employee that the Human Resources department has knowledge of the healthcare costs of every employee, Forrest replied that the statement was false because healthcare information is stored at Blue Cross and is not shared with Alfa in a way that is identifiable to an individual employee.  (Doc. No. 194-11 at 106-07.)  Forrest estimates that he had contact with Blue Cross once a year for the past several years.  (*Id.* at 122.)  At the time of Akridge's termination, Vicki Matthews was Alfa's Benefits Manager and would have had more frequent contact with Blue Cross.  (*Id.* at 123.)  Matthews would have informed Forrest of "anything [he] needed to know."  (*Id.*)  Forrest acknowledged that he would be involved in changes to Alfa's Blue Cross plan but would have no knowledge of how an individual would be affected.  (*Id.* at 124-25.)

[14] According to Coshatt, the insurance filing and verification tasks previously performed by Akridge, which could not be automated, were absorbed by other employees.  (Doc. No. 194-3 at 33-34.)

Akridge desired to remain at Alfa but Coshatt and Plaster did not tell her about any jobs within Alfa to which she could transfer and she did not ask anyone in Human Resources if there was a job available for her.  (Doc. No. 194-2 at 9, 82-84; Doc. No. 194-5 at 65.)  She contacted Al Dees, Alfa's Vice President of Marketing, to ask if he could find a place for her in his division, but Dees responded that he had recently created positions for Kayla Dill and Emily Davenport, two other employees from Akridge's area whose jobs were eliminated.[15]  (*Id.* at 9.)  Akridge did not apply for any open positions at Alfa.[16]  (*Id.* at 8, 10.)

Akridge submits Hilary McCaleb as a comparator.  She asserts McCaleb is a person who worked in Underwriting for Alfa's Property/Home operations and conducted the same kind of loss-reduction workshops for agents and manuals/filing functions.  (Doc. No. 194-11 at 163-64.)  Akridge asserts that McCaleb was not terminated.  (*Id.* at 165.)

Alfa disputes McCaleb was similarly situated to Akridge.  While Forrest did not know McCaleb, Coshatt stated that she performed a number of special projects for the company that could not be automated and that her role at Alfa could not be compared to

---

[15]  Although Akridge contends Dill and Davenport were, like her, in Underwriting, Alfa contends these employees were assigned to the Marketing Division's Guidewire team and in that capacity worked closely with Underwriting.  (Doc. No. 194-9 at 102.)  Akridge did not have any personal knowledge of the circumstances relevant to the transfers of Dill and Davenport to the Marketing Division.  (Doc. No. 194-2 at 9, 14-15.)

[16] According to Akridge, five Underwriting employees were "reduced to lower levels and put back on the clock to work" in May of 2018.  (Doc. No. 194-2 at 13, 15, 64-65.)  She had no personal knowledge of the reasons this decision was made.  (*Id.*)  These employees were identified as Becky Roper, Kim Byrom, Brennan Goray, Teri Williams and Sonya McInvale.  (*Id.* at 13.)  They were allowed to keep their salaries and perform the same job duties.  (*Id.* at 65.)

Akridge's role.  (*Id.*; Doc. No. 194-3 at 51, 106.)  In addition to special projects, McCaleb was involved in the homeowners' inspection program.  (Doc. No. 194-3 at 108-09.)  Chancey acknowledged that employees who assessed insurance risks for home (like McCaleb) and auto (like Akridge) could be cross trained but disputed that McCaleb's job mirrored Akridge's job.  (Doc. No. 194-4 at 46-48.)  According to Chancey, McCaleb was not involved in underwriting.  (*Id.* at 47.)

B.    EEOC Charge Letter

Akridge filed a charge letter with the Equal Employment Opportunity Commission ("EEOC") on December 20, 2016.  (Doc. No. 194-2 at 52.)  Her supporting affidavit alleged that Alfa discriminated against her based upon disability because it terminated her job due to the costs associated with her healthcare, or alternatively, because of its perception that she is disabled and not able to perform her job.  (*Id.* at 54-55, ¶¶ 9-10.)  By letter dated July 27, 2017, the EEOC notified Akridge that, at her request, it was closing its file and she had ninety days from her receipt of the notice to pursue her claim in federal court.  (*Id.* at 62.)

C.    Complaint and Prior Proceedings

On June 9, 2017, Akridge filed a Complaint alleging a single claim of disability discrimination under the Vocational Rehabilitation Act (29 U.S.C. §§ 701, *et seq*.)  (Doc. No. 1.)  On July 31, 2017, she filed an Amended Complaint alleging that Alfa denied her reasonable accommodation and discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq*.  (Doc. No. 15 at ¶¶ 24-25.)  Akridge sought relief including lost pay, costs, reasonable

10

attorneys' fees, compensatory damages, punitive damages, and additional relief deemed appropriate and necessary by the court.  (*Id*. at 7.)

Alfa's motion for summary judgment (Doc. No. 76) was granted by this court on February 20, 2019.  (Doc. No. 139.)  Akridge successfully appealed that decision to the United States Court of Appeals for the Eleventh Circuit.  *See Akridge v. Alfa Mut. Ins. Co*., 1 F.4th 1271 (11th Cir. 2021).  The Circuit found that Akridge was repeatedly — and improperly — denied the ability to depose Alfa's Senior Vice President for Human Resources and Facilities, Scott Forrest.  *See Akridge*, 1 F.4th at 1274-75, 1277.  Because Forrest was listed as the " 'decision' contact" for Alfa's employee insurance plan, the Circuit found it difficult to believe that he "had no information touching on Akridge's medical expenses and termination," and found that his position and corresponding access to medical insurance information was "relevant and thus sufficient to make his testimony discoverable."  *Id*. at 1277.  The Circuit also acknowledged that "if Forrest truly has no such information, we see no reason why he cannot make himself available for questioning and say as much in a deposition."  *Id*.  Alfa's summary judgment victory was therefore vacated, and the case reversed and remanded with specific instructions that Akridge be allowed to depose Forrest.  *Id*. at 1278; (*see* Doc. No. 169).

D.      Motion for Summary Judgment

After Forrest was deposed by Akridge on remand, Alfa again filed a Motion for Summary Judgment.[17]  (Doc. No. 192.)  Alfa argues that Akridge cannot establish a *prima facie* case of disability discrimination under the ADA and cannot show that a comparator employee was treated more favorably that her.[18]  (Doc. No. 193 at 14-16, 16-21.)  Alfa also asserts that it had a legitimate, non-discriminatory reason to terminate her position and that Akridge cannot establish the reason was pretextual.  (*Id*. at 21, 22-28.)

Akridge responds that Coshatt's deposition contained direct evidence of Alfa's discriminatory intent (Doc. No. 196 at 39) and that cumulatively, the deposition testimony of Alfa employees presents a mosaic of circumstantial evidence that would allow a jury to infer Alfa's intentional discrimination (*id*. at 40-47).  Alternatively, Akridge argues that even if the court applies the *McDonnell Douglas* burden-shifting analysis for her ADA claim, her *prima facie* case successfully raises the specter of pretext that allows her claim to be heard by a jury.  (*Id*. at 48-62.)

---

[17] Akridge's Amended Complaint alleges that Alfa failed to provide a reasonable accommodation for her physical handicap.  (Doc. No. 15 at ¶ 24.)  Alfa notes that "in neither her Amended Complaint nor her deposition did [Akridge] identify any time she requested an accommodation, and it was denied."  (Doc. No. 193 at 6, n.1.)  Alfa reasons that because Akridge has failed to support her accommodation claim, it is entitled to summary judgment.  (*Id*. at 14, n.5.)

[18] Alfa does not dispute that, for purposes of its summary judgment motion, Akridge is a qualified individual within the meaning of the ADA.  (Doc. No. 193 at 16.)

### III.   JURISDICTION AND VENUE

This Court exercises subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 12112(a).  The parties do not contest personal jurisdiction or venue, and the Court finds sufficient allegations to support both.

### IV.   DISCUSSION

A.  Motion to Strike

As a preliminary matter, Alfa moves to strike portions of Akridge's affidavits[19] and the entire affidavits of Tony Bohannon,[20] a former Alfa employee, and Rodger Morrison,[21] an associate professor at Troy University, in Troy, Alabama, which Akridge submitted in opposition to Defendant's motion for summary judgment.  (Doc. No. 198.)  Alfa asserts that the contested statements by Akridge are conclusory or not based upon personal knowledge.  (*Id*. at 2-5.)  Alfa also asserts that Bohannon's affidavit is not based upon personal knowledge and that Morrison was not timely designated by Akridge as an expert. (*Id*. at 5-7.)

Akridge defends her own affidavits as either supported by personal knowledge, or as reiterations of factual allegations asserted in her pleadings and supporting evidence. (Doc. No. 199 at 3-7.)  In addition, she contends that the affidavits from Bohannon and Morrison are rationally based on their own perceptions and would be admissible at trial

---

[19] (*See* Doc. No. 195-3.)

[20] (*See* Doc. No. 195-4.)

[21] (*See* Doc. No. 195-19.)

under Federal Rule of Evidence 701 (opinion testimony by a lay witness).[22]  (Doc. No. 199 at 8-9.)

Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  "Sworn statements which fail to meet the standards set forth in [Rule 56(c)(4)] may be subject to a motion to strike." *Dortch v. City of Montgomery*, No. 2:07CV1034-MEF, 2009 WL 959638, at *1 (M.D. Ala. April 8, 2009) (citations omitted).  "However, the Court need not strike the entire affidavit, rather it may strike or disregard the improper portions and consider the remainder of the testimony or statement." *Id*.  Further, the Eleventh Circuit has interpreted Rule 56 as "allowing otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement can be reduced to admissible evidence at trial or reduced to admissible form.").

Considering the statements at issue are purportedly based on the individuals' personal knowledge of the facts and their own perceptions, and because they could testify

---

[22] The parties have danced this dance before, as Alfa filed an earlier motion to strike portions of the same affidavits from Akridge and Bohannon.  (*See* Doc. No. 134.)

at trial, the Court declines to strike the affidavits or portions of the affidavits from the record.  Some statements at issue could be reduced to admissible evidence at trial, thus the Court will give those statements the evidentiary weight they are due.  As to portions of the challenged statements which are improper, the Court will exercise its discretion to disregard any improper portions of the challenged affidavits.  *See Dortch,* 2009 WL 959638, at *1.  Accordingly, Defendant's motion to strike (Doc. No. 198) is due to be denied as moot.

B.   Motion for Summary Judgment as to the Accommodation Claim

As earlier noted, Akridge's Amended Complaint presents an accommodation claim under the ADA.  (Doc. No. 15 at ¶ 24.)  Alfa argues that Akridge has not presented any evidence that she requested, or that Alfa denied, an accommodation.  (Doc. No. 193 at 14, n.5.)  Akridge's brief opposing summary judgment makes no reference to, much less any argument in support of, an accommodation claim.  (*See* Doc. No. 195.)  The Court finds that Akridge's failure to develop her claim constitutes abandonment and that Alfa is entitled to summary judgment on the failure to accommodate claim.  *See Boone v. City of McDonough,* 571 F. App'x 746, 751 (11th Cir. 2014) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) to hold that a plaintiff abandons her claim when she fails to provide argument at the summary judgment stage).  Accordingly, Alfa is entitled to summary judgment on this claim.

C.  Motion for Summary Judgment as to the Disability Discrimination Claim

The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA") provides "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[23]   42 U.S.C. § 12112(a).   Discrimination may be shown through direct evidence, circumstantial evidence under the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or a convincing mosaic of circumstantial evidence.  *Jenkins v. Nell*, 26 F.4th 1243, 1249-1250 (11th Cir. 2022).  A *prima facie* case of discrimination under the ADA is established where a plaintiff shows "at the time of the adverse employment action, she (1) had a disability, (2) was a qualified individual, and (3) was subjected to unlawful discrimination because of her disability." *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018) (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007)).  "The third prong, addressing causation, requires the plaintiff to show that the discriminatory motivation was the but-for cause of the adverse employment action."  *Collier v. Harland Clarke Corp*, 820 F. App'x 874, 879 (11th Cir. 2020) (citing *Holly*, 492 F.3d at 1263 n.17).

Alfa concedes for purposes of summary judgment that Akridge has a disability and is a qualified individual for ADA purposes.  However, it contends that Akridge cannot

---

[23]  The statute defines a "covered entity" as "an employer," and a "qualified individual" as an "individual, who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual hold or desires."  42 U.S.C. § 12111(2), (8).

establish a *prima facie* case because she was not subjected to unlawful discrimination on the basis of her disability.  (Doc. No. 193 at 16.)  Akridge responds that she may discard the "but-for" test for discriminatory intent and proceed under a mixed motive theory of ADA discrimination.  (Doc. No. 196 at 48-49.)  She relies upon *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016) to argue that her disability need only be "a motivating factor" for Alfa's employment decision.  (Doc. No. 196 at 49.)

Akridge's argument misses the mark.  The Eleventh Circuit has limited *Quigg* by noting that the mixed motive test was designed for Title VII actions where race, color, religion, sex, and national origin are potential grounds for statutory violations.  *Barber v. Cellco P'ship*, 808 F. App'x 929, 934-35 (11th Cir. 2020) (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 343, 359-60 (2013)); *see also White v. Winn Dixie*, 741 F. App'x 649, 656 n.2 (11th Cir. 2018).  Because *Barber* forecloses Akridge's alternative route to establishing discrimination, she must present direct evidence of discrimination or prove an ADA violation by circumstantial evidence.  *Barber*, 808 F. App'x at 935.  The Court addresses each theory raised by Akridge below.

1.  Direct Evidence of Discrimination

Direct evidence of disability-based discrimination is evidence that, if believed, proves the existence of a fact in issue without inference or presumption.  *Roberts v. Design & Mfg. Servs., Inc.*, 167 F. App'x 82, 84–85 (11th Cir. 2006).  Evidence that only suggests discrimination or that is subject to more than one interpretation is not direct evidence.  *Merritt v. Dillard Paper Co*., 120 F.3d 1181, 1189 (11th Cir. 1997).  "Only the most blatant

17

remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Akridge asserts that she elicited direct evidence of discrimination based upon Coshatt's agreement that, when assessing the viability of her position in light of Alfa's new potential for automation through Guidewire, he considered her salary and any other benefits as savings for the company.  (Doc. No. 196 at 39.)  According to Akridge, "[t]his admission alone is direct evidence of Alfa's discriminatory attitude and motivation" toward her.  (*Id.*)

In response, Alfa urges the court to consider Coshatt's statement within the context of his testimony.  (Doc. No. 197 at 2-3.)  It directs the court to the Eleventh Circuit's holding that direct evidence is "evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  (*Id.* at 2 (citing *White*, 741 F. App'x at 656 n.1.))

The Court finds that Akridge has not produced direct evidence of discrimination. Coshatt's testimony establishes that Alfa considered saving money by eliminating Akridge's position (*see* Doc. No. 194-3 at 116), but it does not establish that her disability was a factor.  Businesses routinely eliminate positions to cut costs and doing so is not unlawful.[24]  To the contrary, it is unlawful to eliminate a position due to a person's

---

[24] For example, Susan White in Human Resources admitted that she couldn't "speak to any [specific] corporate initiatives for cutting costs," but that Alfa employees "are always charged with running our individual departments in a smart manner, reviewing jobs for necessity" and "are always looking to make sure that we are spending our money wisely."  (Doc. No. 194-9 at 107, 111.)

disability and direct evidence of such action is missing here.  Akridge has not demonstrated that Coshatt or any other decision-maker had knowledge of her healthcare costs when making the decision to terminate her.  (Doc. No. 194-2 at 77.)  At most, Coshatt's remarks show there is evidence that Alfa considered the reduction in costs by eliminating Akridge's salary and benefits if she were terminated.  But this evidence does not prove discrimination. One must infer that such reduction in costs was linked to Akridge's disability in order to prove discrimination and any evidence requiring such an inference does not constitute direct evidence.  *See, e.g., Beatty v. Hudco Indus. Prod., Inc*., 881 F. Supp. 2d 1344, 1354 (N.D. Ala. 2012) (finding that decisionmaker's remark that he was paying a lot of money to the plaintiff and wondered if it was justified given her condition was not direct evidence). Accordingly, Coshatt's statement does not meet the Eleventh Circuit's standard for direct evidence of discrimination because his remarks were not "the most blatant remarks, whose intent could be nothing other than to discriminate."  *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1358 (11th Cir. 1999).  Akridge's claim of direct evidence of discrimination fails.

> 2.  Circumstantial Evidence of Discrimination under *McDonnell Douglas*

As noted above, Alfa concedes the first two prongs of an ADA *prima facie* case for purposes of its motion for summary judgment.  (Doc. No. 193 at 16.)  In showing that her disability was a but-for cause of discrimination, Akridge must identify a proper comparator because "[b]y its very nature . . discrimination is a comparative concept – it requires an assessment of whether 'like' (or instead different) people or things are being treated

'differently.' " *Barber*, 808 F. App'x at 936 (quoting *Lewis*, 918 F.3d at 1223).   An employee "must prove that he and his comparators are 'similarly situated in all material respects.' " *Tamba v. Publix Super Mkt.*, 836 F. App'x 765, 771 (11th Cir. 2020). Additionally, the employee and comparator "must have been engaged in the same basic conduct and subjected to the same work rules." *Id.*

The Court concludes that Akridge has not provided evidence of a comparator who was "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Akridge argues that the five employees demoted in Underwriting – Becky Roper, Kim Byrom, Brennan Goray, Teri Williams and Sonya McInvale – are comparators. (Doc. No. 196 at 57.)  But Akridge could not describe these employees' job functions and merely testified that they were in underwriting.  (Doc. No. 194-2 at 66-68.)  Akridge cannot base a comparator argument on these five persons when she cannot show that they were performing similar job functions.  *Tamba*, 836 F. App'x at 771.

Akridge next submits that Hillary McCaleb is a comparator employee because they both performed risk workshops and worked with manuals and insurance filings.  (Doc. No. 196 at 58.)  While these similarities may have existed, the evidence shows that McCaleb's functions were not automated and thus not the same as Akridge's functions.  (Doc. No. 194-3 at 106, 108-09.)  Akridge strives mightily to explain how she and McCaleb's work functions were essentially interchangeable, but even with the facts construed in her favor for purposes of summary judgment, Akridge cannot impose her view of their similarities upon Alfa's business model.  Chancey testified that Akridge and McCaleb did not have

20

overlapping responsibilities and that McCaleb performed a "very different" job because she was not in underwriting.  (Doc. No. 194-4 at 47.)  Coshatt testified that because McCaleb "does a number of different special projects" and, because her duties could not be automated, he could not compare her to Akridge. (Doc. No. 194-3 at 51.)  Coshett also testified that McCaleb and Akridge had different job responsibilities.  (*Id.* at 109.) Accordingly, the Court cannot conclude that Akridge has created a question of fact that she and McCaleb were "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562. Because Akridge has failed to identify a comparator who was treated more favorably, the Court finds she has failed to establish a *prima facie* case.

Even if Akridge had presented a *prima facie* case of ADA discrimination, she has not demonstrated pretextual reasons for her termination as required under the *McDonnell Douglas* framework.  The burden-shifting analysis under *McDonnell Douglas* provides:

> Once a plaintiff makes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). If an employer clears this "low bar" of production, the plaintiff's *prima facie* case is rebutted, all presumptions drop from the case, and the plaintiff is then required to show that the employer's proffered reason for the action is a pretext for discrimination. *Id.*

*Barber*, 808 F. App'x at 934.

Given Alfa's proffer that it terminated Akridge because her position was no longer needed and the company was cutting costs, the Court turns to whether Akridge produced evidence sufficient to show that Alfa's proffered reason is a pretext for discrimination. Here, the managers who made the decision to eliminate her position – Coshatt, Chancey

and Plaster – each testified that Alfa did not need her position anymore.  Coshatt testified that Guidewire "changed how [Alfa does] business."  (Doc. No. 194-3 at 36.)  When asked whether Akridge had "a lot" of responsibilities that required human interaction and hence, could not be automated, Coshatt replied "[a] lot may be a stretch."  (*Id*. at 34.)  Coshatt explained that Alfa was "able to absorb [Akridge's job duties] into some other employee's responsibilities . . . in addition to leveraging some automation on some of the other responsibilities that she was doing." (*Id*.)  Chancey testified that the Underwriting Division was "looking at all of our positions, what everybody was doing, evaluating the team," and the automation of the strategic underwriting program allowed agents and district managers to "go online and get the reports that a lot of [Akridge's] job duties required her to do [and] we started looking at what else she was doing."  (Doc. No. 194-4 at 20-21.)  According to Chancey, the team evaluation after automation led management to realize that they "did not need that position anymore.  So that's when we decided we needed to eliminate that position."  (*Id*. at 21.)  Plaster corroborated Chancey's explanation of why Akridge's position was no longer needed.  He cited the district managers' ability to get the information previously provided by Akridge.  (Doc. No. 194-5 at 28.)  Plaster testified that Akridge's reports "were just numbers that were delivered to agents and managers" and that Alfa "basically automated her job."  (*Id*. at 30, 34.)  Under repeated questioning about Akridge's "tough luck," Plaster stated "[i]t's just a business decision that was made."  (*Id*. at 35.)

There is simply no evidence Akridge's medical costs had any effect on the decision by Alfa to terminate her position.  Considering the evidence before it, even in the light

most favorable to Akridge, the Court finds that the record does not permit an inference that the costs of Akridge's medical treatments was a motivating factor in the decision to terminate her.  Akridge has not shown that Alfa's proffered reason for her termination is a pretext for discrimination and thus her discrimination claim under *McDonnell Douglas* does not survive summary judgment.

      3.  Convincing Mosaic of Circumstantial Evidence of Discrimination

Notwithstanding the *McDonnell Douglas* framework, Akridge can still overcome a motion for summary judgment by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotations and citation omitted).  "A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  *Lewis*, 934 F.3d at 1185 (internal quotations and citation omitted).

Here, Akridge has not presented evidence to establish a convincing mosaic of discrimination to survive summary judgment.  She does not present circumstantial evidence of suspicious timing, ambiguity, systemically better or worse treatment of similarly situated employees, or pretext to present a convincing mosaic upon which intentional discrimination can be inferred.  Her circumstantial evidence that she was terminated and not considered for another job within the company falls short because she

admits that she did not formally apply for another job at Alfa. (Doc. No. 194-2 at 8, 10.) Akridge also fails to present evidence to refute Alfa's business reasons for her termination or to demonstrate that their reasons were false and that the real reason was discrimination due to her disability. Key in this shortcoming is a lack of evidence that any Alfa employee had knowledge of Akridge's healthcare costs, notwithstanding her feeling that her individual Blue Cross records were accessed improperly. (Doc. No. 194-2 at 77.) Akridge's feelings or suspicions alone are not sufficient to survive summary judgment. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996) ("[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment."). *See, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value).

Further, other courts examining similar evidence have concluded that a lack of evidence of knowledge of the plaintiff's specific healthcare costs means that the decisionmaker did not consider the plaintiff's disability in the decision. *See Giles v. Transit Employees Fed. Credit Union,* 794 F.3d 1, 10–11 (D.C. Cir. 2015) (holding that no reasonable jury could conclude that the real reason for plaintiff's discharge was that medical expenses were driving up insurance premiums when there was no evidence that the employer knew what the plaintiff's treatment cost was or that a decisionmaker thought that her medical costs caused premiums to increase); *see also Libel v. Adv. Lands of Am., Inc.,* 482 F.3d 1028, 1034 (8th Cir. 2007) (upholding summary judgment and stating that, even assuming that termination was linked to concerns of rising insurance costs, "no

evidence, direct or circumstantial, links [the] termination to [the plaintiff's] M.S. and rising insurance costs"). This Court is persuaded by that analysis. In this case, there is affirmative evidence that Forrest, Coshatt, Plaster, and Chancey were not aware of Akridge's healthcare costs, or other employees' healthcare costs when the decision to terminate Akridge was made. The fact that Alfa was self-insured and that Alfa's management team wanted to control costs is not sufficient to call that evidence into question. Even when viewed in the light most favorable to Akridge, her factual showing does not create a triable claim of disability discrimination. Accordingly, Alfa's motion for summary judgment is due to be granted on Akridge's ADA discrimination claim.

## V.     CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1. Defendant's Motion to Strike (Doc. No. 198) is DENIED as moot.

2. Defendant's Motion for Summary Judgment (Doc. No. 192) is GRANTED.

A separate judgment will be entered.

DONE this 12th day of May, 2022.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE